UNITED STATES DISTRICT COURT                    c
WESTERN DISTRICT OF LOUISIANA
ALEXANDRIA DIVISION

DAVID PAUL AYMOND            CIVIL ACTION NO. 1:15-CV-02489

VERSUS                       CHIEF JUDGE DRELL

U.S. COMMISSIONER OF         MAGISTRATE JUDGE PEREZ-MONTES
SOCIAL SECURITY

---

## REPORT AND RECOMMENDATION

David Paul Aymond ("Aymond") filed an application for Social Security Disability Insurance Benefits ("DIB") (Doc. 11, p. 127/326) and an application for Supplemental Security Income ("SSI") (Doc. 11, p. 121/326) on February 5, 2013. Aymond alleged a disability onset date of March 15, 2010. (Doc. 11, pp. 121, 127/326). Aymond's DIB and SSI claim was denied by the Social Security Administration on May 7, 2013. (Doc. 11, pp. 74, 78/326).

A *de novo* hearing was held on February 20, 2014 before an administrative law judge ("ALJ"), at which Aymond appeared with his attorney and a vocational expert ("VE"). (Doc. 11, p. 34/326). The ALJ issued a partially favorable decision denying benefits from the alleged onset date until January 2014, but granting DIB and SSI disability benefits as of January 2014 forward based on a change in age classification. (Doc. 11, p. 29/326). The ALJ found that Aymond had severe impairments of degenerative changes of the lumbar spine and blindness in his left eye, but that he did not have an impairment or combination of impairments that meets or medically equals one of the listed impairments. (Doc. 11, pp. 22-23/326). The ALJ also concluded

that Aymond has been unable to perform his past relevant work of a farm worker, jailer, or stocker since March 15, 2009. (Doc. 11, p. 27/326).

The Appeals Council denied Aymond's request for review, and the ALJ's decision became the final decision of the Commissioner of Social Security ("the Commissioner"). (Doc. 11, p. 6/326).

Aymond next filed this appeal for judicial review of the Commissioner's decision. Aymond raises four issues: (1) whether the ALJ erred in failing to find that Aymond had a severe impairment of slowed cognition; (2) whether the ALJ erred in evaluating the medical opinion evidence; (3) whether the ALJ properly assessed Aymond's residual functional capacity; and (4) whether the ALJ erred by relying upon the Medical-Vocational Guidelines (Grid Rules) at step five. (Doc. 16).

The Commissioner filed a brief in response to Aymond's appeal (Doc. 19), to which Aymond replied (Doc. 22). Aymond's appeal is now before the Court for disposition.

<u>Eligibility for DIB</u>

To qualify for disability insurance benefits, a plaintiff must meet certain insured status requirements, be under age 65, file an application for such benefits, and be disabled as defined by the Social Security Act.  <u>See</u> 42 U.S.C. §§ 416(i), 423. Establishment of a disability is contingent upon two findings.  First, a plaintiff must suffer from a medically determinable physical or mental impairment that can be expected to result in death or that has lasted, or can be expected to last, for a continuous period of not less than 12 months.  <u>See</u> 42 U.S.C. § 423(d)(1)(A).  Second,

the impairments must render the plaintiff unable to engage in the work previously performed or in any other substantial gainful employment that exists in the national economy.  See 42 U.S.C. § 423(d)(2).

Scope of Review

In considering Social Security appeals, the Court is limited by 42 U.S.C. § 405(g) to a determination of whether substantial evidence exists in the record to support the Commissioner's decision and whether there were any prejudicial legal errors.  See McQueen v. Apfel, 168 F.3d 152, 157 (5th Cir. 1999).  For the evidence to be substantial, it must be relevant and sufficient for a reasonable mind to support a conclusion; it must be more than a scintilla but need not be a preponderance.  See Falco v. Shalala, 27 F.3d 160, 162 (5th Cir. 1994) (citing Richardson v. Perales, 402 U.S. 389, 401 (1971)).  Finding substantial evidence does not involve a simple search of the record for isolated bits of evidence which support the Commissioner's decision, but must include a scrutiny of the record as a whole.  The substantiality of the evidence must take into account whatever in the record fairly detracts from its weight.  See Singletary v. Bowen, 798 F.2d 818, 823 (5th Cir. 1986).

A court reviewing the Commissioner's decision may not retry factual issues, reweigh evidence, or substitute its judgment for that of the fact-finder.  See Fraga v. Bowen, 810 F.2d 1296, 1302 (5th Cir. 1987); Dellolio v. Heckler, 705 F.2d 123, 125 (5th Cir. 1983).  The resolution of conflicting evidence and credibility choices is for the Commissioner and the ALJ, not the court.  See Allen v. Schweiker, 642 F.2d 799, 801 (5th Cir. 1981); see also Anthony v. Sullivan, 954 F.2d 289, 295 (5th Cir. 1992).

3

However, the court does have authority to set aside factual findings that are not supported by substantial evidence and to correct errors of law.  See <u>Dellolio</u>, 705 F.2d at 125.  But to make a finding that substantial evidence does not exist, a court must conclude that there is a "conspicuous absence of credible choices" or "no contrary medical evidence."  <u>See</u> <u>Johnson v. Bowen</u>, 864 F.2d 340 (5th Cir. 1988); <u>Dellolio</u>, 705 F.2d at 125.

I.    <u>Summary of Pertinent Facts</u>

    A.    <u>Medical Records</u>

Aymond was 49 years old when he applied for disability benefits in February 2013. (Doc. 11, pp. 121, 127/326). Aymond has a fifth grade education and past relevant work as a stocker, security, and farm work (Doc. 11, p. 144/326).

On March 16, 2009, Aymond presented to the Bunkie General Hospital Emergency Department with a complaint of moderate back pain that started the day prior while moving a heavy object at work. (Doc. 11, p. 295/326). Aymond was diagnosed with sprain/strain of the lumbar region and prescribed Robaxin and Tylenol #3 and sent home. (Doc. 11, p. 296/326).

On March 25, 2009, Aymond received an x-ray showing mild degenerative changes of the lumbar spine. (Doc. 11, p. 225/326). An MRI showed degenerative disc and facet disease. (Doc. 11, p. 227/326). He was given a referral to physical therapy. (Doc. 11, pp. 229-30/326).

On April 14, 2009, Aymond began receiving physical therapy from Avoyelles Physical Therapy. (Doc. 11, p. 207/326). The initial examination indicated that

Aymond had severe lower back pain, mild guarding of lower trunk, and functional limitations in that he was unable to lift or carry heavy objects, and unable to squat or stoop. (Doc. 11, pp. 208-09/326). Aymond was scheduled to receive treatment three times a week for four weeks. (Doc. 11, p. 209/326). Despite physical therapy, Aymond's complaints remained persistent, and he completed physical therapy in August 2009. (Doc. 11, pp. 224, 239/326).

On May 6, 2009, Aymond presented for an exam with Dr. W. Stanley Foster ("Dr. Foster") at the Acadiana Orthopedic Group following his back injury. Aymond's lumbar and lumbosacral spine area was examined, and an x-ray of the lumbosacral spine was performed which showed significant spurring and changes at L3-4 and to a lesser extent on the vertebral bodies of L4-5 and L5-S1. A review of the MRI from Bunkie General dated March 25, 2009 showed disc desiccation and bulging and facet hypertrophy, among other findings. Dr. Foster assessed Aymond with lower back pain and lumbar disc degeneration and ordered physical activity restrictions, namely sedentary activity and no lifting of items weighing more than 10 pounds. (Doc. 11, pp. 276-78/326).

On May 27, 2009, Aymond presented for his three week follow-up exam with Dr. Foster. Aymond indicated that his lower back pain was the same with slight help from a Medrol dose pak. Dr. Foster stated that Aymond was not fit for work. A corticosteroid injection into a lumbar joint and a consultation with a physical therapist was planned. (Doc. 11, p. 275/326).

On June 11, 2009, following the referral by Dr. Foster, Aymond received his first lumbar epidural steroid injection at Lafayette Surgical Specialty Hospital. (Doc. 11, p. 309/326).

On June 18, 2009, at the follow-up with for his first injection, Aymond reported that he was pain free the day of the injection, but he had pain again the next day in the right leg and has had variable amounts of relief since then, and improvement in walking tolerance. (Doc. 11, pp. 306, 308/326).

On June 30, 2009, Aymond had his second injection. (Doc. 11, p. 306/326). At the follow-up on July 13, 2009, Aymond reported minimal relief following the injection and soreness in his lower back. (Doc. 11, p. 304/326).

On August 11, 2009, Aymond had his third steroid injection. (Doc. 11, p. 303/326). Aymond reported improvements, specifically decreased severity and frequency of lumbar symptoms with the current treatment of lumbar epidural steroid injections, physical therapy, and medication management.

On August 27, 2009, Aymond presented for an exam with Dr. Foster. Aymond indicated that when he does anything with his back, he begins to experience back pain. They determined Aymond would try a work hardening program in order to strengthen his back. (Doc. 11, p. 274/326).

On September 30, 2009, Aymond had a follow-up exam with Dr. Foster where Dr. Foster noted Aymond is making progress in the work hardening program, but that he still had tenderness to palpation at the right SI joint and posterior superior iliac spine. (Doc. 11, p. 273/326).

On November 4, 2009, Dr. Foster indicated Aymond returned with the same pain. Dr. Foster indicated that he did not feel there was anything surgical that could help him, and that they would obtain an FCE and try to find him another job. (Doc. 11, p. 272/326).

On December 16, 2009, Dr. Foster reviewed Aymond's FCE and indicated that it did not give him any set answer and "[a]ll it does is tell me that if he has 20 more visits there, that he can get him into what I think is a light to medium duty job." (Doc. 11, p. 271/326).

On March 24, 2010, Dr. Foster noted that at one year post injury, Aymond was at maximum medical recovery. Dr. Foster noted that, in the Fifth Edition Guidelines for Permanent Impairment, Aymond falls into Lumbar Category II and has an 8% impairment of the whole person secondary to motion changes and reflex changes. (Doc. 11, p. 270/326).

On November 30, 2010, Dr. Foster noted that Aymond's condition remained about the same, and that he could not do any bending or heavy lifting, and recently had severe pain radiating across his back. Aymond's prescriptions for Celebrex and Ultracet were refilled. Dr. Foster noted that he believed Aymond would be on the medications long term. (Doc. 11, p. 269/326).

On October 13, 2011, Aymond presented to the Bunkie General Hospital Emergency Department with a complaint of ear pain. (Doc. 11, p. 258/326). He was diagnosed with ceumen impaction. (Doc. 11, p. 261/326).

On April 13, 2013, Aymond presented to Southern Medical Group for a physical exam with Dr. Jeffrey Hilbun ("Dr. Hilbun") following a referral from the Louisiana Office of Disability Determinations Services regarding Aymond's complaints of vision problems and back injury. (Doc. 11, pp. 279-80/326). Aymond reported that he had injured his back two years prior and had obtained an MRI which showed a ruptured disc, but had not had surgery. Aymond reported no relief from physical therapy and stated he was only taking over-the-counter medications. On the physical exam, Aymond was able to rise from a sitting position without assistance, stand on his tiptoes, but had moderate difficulty with bending and squatting. (Doc. 11, p. 281/326). In a review of symptoms, Aymond denied any recent change in visual acuity. (Doc. 11, p. 280/326). Dr. Hilbun noted that Aymond had visual acuity of 20/blind OD, 20/30-1 OS. (Doc. 11, p. 281/326).

Dr. Hilbun also noted that Aymond appeared to have slowed cognition and had difficulty following commands. The physician additionally noted that Aymond stutters and has difficulty recalling information. Otherwise, Dr. Hilbun noted that Aymond appeared neither depressed nor anxious, he was able to communicate with no deficits, and that his recent and remote memory were intact. (Doc. 11, p. 281/326).

Dr. Hilbun advised Aymond to follow up with a primary care physician and an orthopedic surgeon for his chronic low back pain. Additionally, although the physician noted that it may be the patient's baseline, since the exam showed slowed cognition and difficulty recalling information and following commands, Aymond was advised to follow up with a primary care physician for further work-up. (Doc. 11, p. 282/326).

8

The physician concluded that, based on the examination and objective evidence, that Aymond had no limitation to sit and to lift and carry objects. Additionally, Dr. Hilbun noted that Aymond had mild to moderate limitations in walking and/or standing for a full workday. Aymond could hold a conversation, respond appropriately to questions, carry out and remember instructions, but may have some difficulty with those tasks. (Doc. 11, p. 282/326).

On May 2, 2013, a request for medical advice was sent to Briana Simmons (non-single decision maker) for an assessment of Aymond's current physical residual functional capacities. She stated that evidence supports a medium residual functional capacity. (Doc. 11, p. 285/326).

On May 12, 2013, Aymond presented to Bunkie General Hospital with a complaint of back pain. (Doc. 11, p. 291/326). Aymond noted that it was chronic, moderate pain that had lasted for one week. (Id.). The physician performed a physical exam and noted tenderness in his back. (Id.). Aymond was prescribed medication and sent home. (Doc. 11, p. 292/326).

On June 17, 2013, Aymond presented to Huey P. Long Medical Center with complaints of lower back pain. He stated that he had not been working since that date and wanted to go on disability. He stated that he was currently taking medication that he had received at Bunkie General Hospital two to three weeks prior, but that he wanted his back checked out. He stated he had mild back pain, made worse with sitting and standing, but denied weakness. (Doc. 11, p. 319/326). During the physical exam, the physician noted a normal range of motion. Additionally, the

physician noted that the patient was "sitting comfortably in bed, not in pain, both legs swinging and dangling from the floor." (Doc. 11, p. 320/326). The physician ordered an x-ray and noted spurring and degeneration on the x-ray. (Doc. 11, p. 321/326). Additionally, radiology noted minimal anterior spondylosis at multiple levels. (Doc. 11, p. 322/326). Physician's final diagnoses included chronic low back pain and back pain. (Doc. 11, p. 321/326).

**B.**     <u>**Administrative Hearing**</u>

At the February 20, 2014 administrative hearing, Aymond appeared with his attorney and a VE. (Doc. 11, p. 36/326). Aymond testified that he was 50 years old, is 6'4" and weighs about 220 pounds. (Doc. 11, pp. 37-38/326). Aymond has a driver's license and is able to drive. (Doc. 11, pp. 37-38/326). Aymond stated that he went to fifth grade in school and quit at 16 years, but was cut off before he could finish the sentence. (Doc. 11, p. 38/326). Aymond stated he had worked previously as a security guard, in maintenance and as a stocker at Walmart, and helped on a farm. (Doc. 11, pp. 38-39/326). Aymond further stated he has not worked since 2008. (Doc. 11, p. 38/326).

Aymond testified that he took medication for muscle spasms but that he did not know the name of it. He stated that the medication works and that he does not suffer side effects from it. (Doc. 11, p. 39/326).

Aymond testified that he is only able to walk for about five minutes before he has to sit down. (Doc. 11, p. 39/326). He further testified that he is only able to stand for about two minutes and sit for two to five minutes before needing to get up. (Doc.

11, p. 40/326). He testified that he is only able to lift about ten pounds. (Id.).  He additionally stated that he is not getting any mental health treatment. (Id.).

Aymond testified that he does not do any housework, laundry, or shopping, and that his mother handles those matters. (Doc. 11, p. 40/326).

Aymond further testified that he was in special education at school. (Doc. 11, p. 41/326). He additionally stated that he did not currently have medical insurance or Medicaid and was therefore unable to afford injections to relieve his pain. (Doc. 11, pp. 41-42/326).

Aymond stated that while working at his prison job, he would have to get up and walk around if he had been sitting too long. (Doc. 11, p. 42/326). He stated that while he did not really have any problems doing the job, they let him go due to his back issues. (Doc. 11, p. 42/326).

Although Aymond's attorney asked a question regarding his ability to read paperwork at his prison job, Aymond seemed to misunderstand the question and stated that if he doesn't want to stand, he gets someone to help him. (Doc. 11, p. 42/326). Aymond testified that if he needs to look up a name in the phone book or read mail, his mother helps him with it. (Doc. 11, p. 43/326). When Aymond took his driver's test, they had to help him with reading it. (Id.). In response to a question regarding whether he can read a newspaper article, he stated "not really." (Id.). Additionally, Aymond stated that if he had to write a note to his mother to ask her to run some errands for him, he would need her help with it, as well as have her help to pay the bills. (Doc. 11, p. 43/326).

11

Aymond stated that he has been blind in his right eye since he was ten years old. (Doc. 11, p. 43/326). He additionally testified that he takes a muscle relaxer and meloxicam for inflammation for his back problem. (Doc. 11, pp. 43-44/326).

Aymond testified that he would not be able to work at a job that was five days a week where he would have to be on his feet, off and on, six out of eight hours. (Doc. 11, p. 44/326). Aymond testified that his last job was as a stocker at Fred's. (Id.). When he went to the emergency room at Huey P. Long on June 17, he stated to them that his back had been bothering him for the last five years. (Id.).

The VE testified that Aymond's job as a farm worker was heavy work, SVP: 2, and unskilled (DOT 404.687-010). His job as a jailer is light work, SVP: 4 (DOT 372.367-014). His job as a stocker is medium, SVP:2 (DOT 922.687-058). His work in maintenance/cleaning, is heavy, SVP:2, and unskilled (DOT 381.687-014). The VE testified that the record indicated that this work was performed as performed in the national economy. (Doc. 11, p. 46/326). However, the VE did add that he would have some questions about the jailer work based on the testimony, and asked Aymond questions based on his testimony. (Id.).

The VE asked Aymond, based on the fact that Aymond had trouble reading, how Aymond performed his job as a jailer. Aymond testified that they would help him write things down and keep track of things. In response to a question regarding whether Aymond could write letters and numbers and similar things, he replied "[n]ot that good." (Doc. 11, p. 47/326). Specifically, Aymond noted trouble with spelling and understanding things, and that he would need people to read things to him. (Id.).

12

In response to a question from the VE about what Aymond did in his position at the prison, Aymond testified that he would walk around and keep an eye on things, and if given tasks, he would have them help him understand it, and that he would count the inmates with help. He stated that although he can count, if he makes mistakes, he "just get[s] them to understand what's going on here." (Doc. 11, p. 48/326).

Based on Aymond's responses to the VE's questions, the VE stated that it sounded like Aymond had accommodations while at that job. (Doc. 11, p. 48/326).

The ALJ asked the VE that if the claimant was 50 years old, had a 5th grade special education, with the exertional ability to perform sedentary work and the limitation of monocular vision, whether the claimant would be able to return to his past work. The VE stated that he could not return to his past work, as all of the past work exceeded the sedentary level. The VE further stated that Aymond does not have transferable skills. (Doc. 11, p. 49/326).

C.   <u>ALJ's Findings</u>

To determine disability, the ALJ applied the sequential evaluation process outlined in 20 C.F.R. § 404.1520(a) and 20 C.F.R. § 416.920(a). The sequential process required the ALJ to determine whether Aymond (1) is presently working; (2) has a severe impairment; (3) has an impairment listed in or medically equivalent to those in 20 C.F.R. Pt. 404, Subpt. P, App. 1 ("Appendix 1"); (4) is unable to do the kind of work he did in the past; and (5) can perform any other type of work. If it is determined at any step of that process that a claimant is or is not disabled, the sequential process

ends. A finding that a claimant is disabled or is not disabled at any point in the five-step review is conclusive and terminates the analysis. See Greenspan v. Shalala, 38 F.3d 232, 236 (5th Cir. 1994), cert. den., 914 U.S. 1120 (1995) (citing Lovelace v. Bowen, 813 F.2d 55, 58 (5th Cir. 1987).

To be entitled to benefits, an applicant bears the initial burden of showing that he is disabled. Under the regulations, this means the claimant bears the burden of proof on the first four steps of the sequential analysis. Once this initial burden is satisfied, the Commissioner bears the burden of establishing that the claimant is capable of performing work in the national economy. See Greenspan, 38 F.3d at 237.

In Aymond's case, the ALJ found that Aymond had not engaged in substantial gainful activity since the alleged onset date, March 15, 2009. (Doc. 11, p. 22/326). The ALJ further found that he met the insured status requirements of the Social Security Act through June 30, 2014. (Id.). The ALJ additionally found that Aymond has the severe impairments of degenerative changes of the lumbar spine and blindness in the left eye, but that he does not have an impairment or combination of impairments listed in or medically equal to one listed in Appendix 1. (Doc. 11, pp. 22-23/326). The ALJ also found that Aymond had the residual functional capacity to perform sedentary work, except with monocular vision. (Doc. 11, p. 24/326).

The ALJ determined that Aymond's allegations of severe pain were not fully credible and were not supported by the evidence of record. (Doc. 11, p. 26/326). Furthermore, the ALJ detailed Aymond's complaints of illiteracy and found that the evidence about his ability to read and write was sparse, but that the totality of the

evidence presented suggested that Aymond was able to read and write consistent with his marginal education level. (Id.). The ALJ further found that there was no medical evidence to substantiate Aymond's limitation for sitting and that Aymond's ability to work despite his pre-existing right eye blindness supported a finding that Aymond was not disabled. (Doc. 11, pp. 26-27/326). The ALJ gave great weight to the opinion evidence of Dr. Foster and some weight to the opinion of Dr. Hilbun, the consultative examiner, regarding Aymond's physical limitations. (Doc. 11, p. 27/326). However, the ALJ gave no weight to Dr. Hilbun's opinion that the claimant would have difficulty responding appropriately to questions, and carrying out and remembering instructions. (Id.) As to the opinion of the state agency consultant, the ALJ gave some weight to the physical limitation evidence but great weight to the statement stating there was nothing in the record regarding a potential mental impairment. (Doc. 11, p. 27/326).

The ALJ found that the claimant had been unable to perform any past relevant work since March 15, 2009, as it exceeded his residual functional capacity. (Doc. 11, p. 27/326). The ALJ further found that Aymond was initially a younger individual but that his age category changed on January 5, 2014 to an individual closely approaching advanced age. (Doc. 11, p. 28/326). Prior to the age category change, considering Aymond's age, education, work experience, and residual functional capacity, the ALJ determined that there were jobs that existed in significant numbers in the national economy that Aymond could have performed. (Id.). Following January 5, 2014 and the age category change, the ALJ determined that there were no jobs that existed in

significant numbers in the national economy that Aymond could have performed. (Doc. 11, p. 29/326). Thus, Aymond was not disabled prior to January 5, 2014, but became disabled on that date. (Id.).

## II.   Law and Analysis

### A.   The ALJ did not err in not finding Aymond suffered from the medically determinable, severe impairment of slowed cognition.

Aymond contends that the ALJ erred in failing to find his slowed cognition to be a medically determinable, severe impairment, and failed to apply the correct standard in determining severity.

The regulations state that an "impairment must result from anatomical, physiological, or psychological abnormalities which can be shown by medically acceptable clinical and laboratory diagnostic techniques." 20 C.F.R. § 404.15808. Furthermore, "a physical or mental impairment must be established by medical evidence consisting of signs, symptoms, and laboratory findings, not only by your statement of symptoms." Id. While symptoms are the person's own description of their impairment, these statements alone are not enough to establish an impairment. 28 C.F.R. § 404.1528(a).   Signs are defined as "anatomical, physiological, or psychological abnormalities which can be observed, apart from your statements (symptoms). Signs must be shown by medically acceptable clinical diagnostic techniques." 28 C.F.R. § 404.1528(b). Laboratory findings are defined as "anatomical, physiological, or psychological phenomena which can be shown by the use of medically acceptable laboratory diagnostic techniques." 28 C.F.R. § 404.1528(c).

16

"Regardless of how many symptoms an individual alleges, or how genuine the individual's complaints may appear to be, the existence of a medically determinable physical or mental impairment cannot be established in the absence of objective medical abnormalities; i.e. medical signs and laboratory findings." SSR 96-4p.

As to the mental status portion of the physical exam, Dr. Hilbun stated that Aymond appeared to have slowed cognition and had difficulty following commands. The physician additionally noted that he stutters and has difficulty recalling information. Otherwise, Aymond did not appear depressed or anxious, and was able to communicate with no deficits, and his recent and remote memory were intact. Dr. Hilbun concluded that Aymond could hold a conversation, respond appropriately to questions, and carry out and remember instructions, but may have some difficulty with these tasks. (Doc. 11, p. 281/326). Additionally, although the physician noted that it may be the patient's baseline, Aymond was advised to follow up with a primary care physician for further work-up. (Doc. 11, p. 282/326). The ALJ only gave some weight to the opinion of Dr. Hilbun, the consultative examiner, regarding Aymond's physical limitations, but gave no weight to his opinion that the claimant would have difficulty responding appropriately to questions, and carrying out and remembering instructions. (Id.)

The weight afforded a consulting examiner's opinion depends upon his examining and treating relationship with the claimant, the evidence the doctor presents to support his or her opinion, how consistent the opinion is with the record as a whole, the doctor's specialty, and other factors. See 20 C.F.R. §§ 404.1527(c),

17

416.927(c). The opinion of any physician may be discounted when objective medical signs and diagnostic testing do not support the opinion, or if the opinion is inconsistent with the record as a whole. See id. "It is 'within the discretion of the ALJ to determine the credibility of the various medical reports in the record.'" Bayer v. Colvin, 557 F. App'x 280, 288-89 (5th Cir. 2014) (quoting Griego v. Sullivan, 940 F.2d 942, 945 (5th Cir. 1991)). Further, a doctor's opinion lacks persuasive weight when it is not supported by longitudinal medical evidence in the record. Id.

The only diagnosis of Aymond's slowed cognition was the opinion of Dr. Hilbun, the one-time consultative examiner, who advised Aymond to follow up with a primary care physician for further work-up. None of Aymond's other physicians noted any issues with Aymond's cognitive function. The record is devoid of any similar complaints made by Aymond to any of his doctors or indications of any similar problems by Aymond's doctors.

Dr. Hilbun's evaluation presented little in the way of evidence to support his opinion and lacked explanation as to how he came to his conclusion. See 20 C.F.R. § 404.1527(c)(3). Additionally, Dr. Hilbun was unsure if this was patient's baseline, but noted that Aymond should follow up with a primary care physician for further work up. Nothing in the record prior to Dr. Hilbun's examination of Aymond shows evidence of the medically determinable, severe impairment of slowed cognition. It was Aymond's responsibility to establish the presence of a medically determinable impairment with acceptable medical evidence. Substantial evidence supports the ALJ's decision to find Aymond did not have a mental impairment.

Similarly, Aymond states that, in addition to the mental limitations identified by Dr. Hilbun, he is illiterate, and to the extent that his illiteracy is a symptom of his slowed cognition, it should have been included in the ALJ's RFC. Aymond contends that the ALJ's finding that he was not illiterate is not based on substantial evidence.

20 C.F.R. § 404.1564(b) states in part:

In evaluating your educational level, we use the following categories:

(1) Illiteracy. Illiteracy means the inability to read or write. We consider someone illiterate if the person cannot read or write a simple message such as instructions or inventory lists even though the person can sign his or her name. Generally, an illiterate person has had little or no formal schooling.
(2) Marginal education. Marginal education means ability in reasoning, arithmetic, and language skills which are needed to do simple, unskilled types of jobs. We generally consider that formal schooling at a 6th grade level or less is a marginal education.

In this case, the ALJ determined that Aymond was not illiterate because he was able to read and write "to a degree consistent with his marginal education level."[1] (Doc. 11, p. 26/326). The ALJ noted that the evidence regarding Aymond's ability to read and write was sparse, but stated that the totality of the evidence suggested that Aymond was able to read and write to a degree consistent with his marginal educational level. (Id.). The ALJ found that Aymond's Disability Report, in addition to Aymond's job history, outweighed the statements made by Aymond at the hearing. (Id.). The fact that there is evidence in the record to support Aymond's arguments

---

[1] Aymond correctly points out that the ALJ made a statement indicating that "the claimant has a limited education." (Doc. 11, p. 28/326). However, Aymond argues that the error was harmful since the ALJ had erred in not finding that Aymond was illiterate. But as noted above, the ALJ discussed her finding regarding Aymond's educational level, finding him to have a marginal education and his literacy being consistent with that educational level.

19

does not negate the substantial evidence that supported the ALJ's conclusion as to Aymond's education level and lack of mental impairments.

**B.    The ALJ correctly analyzed the medical opinion evidence.**

Aymond next contends that the ALJ erred in her analysis of medical opinion and evidence. Specifically, Aymond alleges it was error for the ALJ to give "great weight" to the opinions of a non-examining, non-medical source, rather than its own examining physician, Dr. Hilbun, and for failing to offer any definitive reason for rejecting his diagnosis of "slowed cognition." Aymond contends that Dr. Hilbun's opinion is entitled to controlling weight.

While the ALJ gave some weight to Dr. Hilbun's opinion on Aymond's ability to sit and lift/carry objects, the ALJ gave no weight to Dr. Hilbun's opinion that Aymond would have difficulty responding appropriately to questions, and carrying out and remembering instructions, since there was nothing in the record regarding a potential mental impairment. Additionally, the ALJ gave great weight to the statement from the state agency medical consultant that there was nothing in the record regarding a potential mental impairment. (Doc. 11, p. 27/326). Aymond disputes there was nothing in the record as to his slowed cognition, since Dr. Hilbun offered his diagnosis regarding Aymond's mental state and due to Aymond's testimony at the hearing as well as his interview for his disability report.

Defendant argues that the ALJ is free to reject the opinion of any physician when the evidence supports a contrary conclusion. Defendant additionally concedes that Brianna Simmons is not an acceptable medical source.

It is well established that the opinion of an examining physician should be accorded greater weight than the opinion of a non-examining source. 20 C.F.R. §§ 404.1527(c)(1), 416.927(c)(1). Further, the opinion of a treating physician who is familiar with the claimant's impairments, treatments, and responses, should be accorded great weight in determining disability. Newton v. Apfel, 209 F.3d 448, 455 (5th Cir. 2000); Greenspan v. Shalala, 38 F.3d 232, 237 (5th Cir. 1994), cert. denied, 514 U.S. 1120, 115 S.Ct. 1984, 131 L.Ed.2d 871 (1995). The only medical source opinions that may be granted controlling weight are treating sources. 20 C.F.R. §§ 404.1527(d), 416.927(d). "A treating physician is one who has provided treatment to the claimant on more than one occasion." Lambert v. Astrue, No. 2:09-cv-0792, 2012 WL 2254313, at *6 (W.D.La. June 14, 2012) (citing Social Security Disability Law and Procedure Sec. 2:26).

Dr. Hilbun's opinion regarding Aymond's physical state was given some weight, as it was generally consistent with the evidence of record, although the ALJ found that Aymond had some limitations on his ability to lift and carry. However, no weight was assigned to his statements regarding Aymond's mental state. The ALJ stated that the record contained nothing regarding a potential mental impairment. "An ALJ is free to reject a physician's opinion when good cause exists. 'Good cause may permit an ALJ to discount the weight of a treating physician relative to other experts where the treating physician's evidence is conclusory, is unsupported by medically acceptable clinical, laboratory, or diagnostic techniques, or is otherwise unsupported by the evidence.'" Giles v. Astrue, 433 F. App'x 241, 246-47 (5th Cir.

21

2011). When only part of a physician's opinion is supported by the record, it is proper for an ALJ not to afford weight to the unsupported portion of the opinion. <u>Jones v. Heckler</u>, 702 F.2d 616, 622 (5th Cir. 1983).

Furthermore, Dr. Gerald Dzurik, M.D. ("Dr. Dzurik") signed off on the Disability Determination Explanation along with Brianna Simmons. (Doc. 11, pp. 61, 72/326). As to the opinion of Dr. Dzurik, the ALJ gave some weight to the physical limitation evidence but great weight to the statement stating there was nothing in the record regarding a potential mental impairment. (Doc. 11, p. 27/326). This opinion was consistent with the record and with the reason the ALJ discounted Dr. Hilbun's assessment of Aymond's mental limitations.

### C.   The ALJ did not err in her RFC findings.

Aymond next contends that the ALJ erred in failing to consider evidence from J. Stewart, the disability interviewer, and from Aymond's mother in determining that Aymond had no mental limitations consistent with Dr. Hilbun's opinion, and thus was harmful error since it resulted in a failure to account for all of Aymond's limitations in the RFC.

The ALJ determined that, since March 15, 2009, Aymond had the residual functional capacity to perform sedentary work as defined in 20 C.F.R. § 404.1567(a) and § 416.967(a) except monocular vision, and noted that the evidence of record failed to demonstrate greater limitations. (Doc. 11, pp. 24, 27/326). In her decision, the ALJ stated that Aymond's counsel argued that he was illiterate. The ALJ noted that the evidence of Aymond's ability or inability to read or write was sparse, but that the

totality of the evidence suggested that Aymond was able to read and write to a degree consistent with a marginally educated vocational category, and that it does not suggest a finding of illiteracy. The ALJ further stated that Aymond's ability to work as a security guard with an SVP of 4 confirmed that Aymond was not illiterate. The ALJ further noted Aymond's Disability Report indicated that he could read and understand English, and that "he could write [more] than his name in English." Therefore, the ALJ determined that his literacy was consistent with marginal education and did not find him illiterate. (Doc. 11, p. 26/236). The ALJ also noted Aymond's consultation with Dr. Hilbun, and found that his opinion that Aymond would have difficulty responding appropriately to questions, and carrying out and remembering instructions, had no weight, as there was nothing in the record regarding a potential mental impairment. (Doc. 11, p. 27/326).

To determine a claimant's residual functional capacity, the regulations require that the ALJ consider all of the relevant evidence and address the claimant's exertional and non-exertional limitations. Irby v. Barnhart, 180 Fed.Appx. 491, 493 (5th Cir. 2006). "Residual functional capacity 'is an administrative assessment of the extent to which an individual's medically determinable impairment(s), including any related symptoms, such as pain, may cause physical or mental limitations or restrictions that may affect his or her capacity to do work-related physical and mental activities.'" Id. (citing SSR 96-8p); see also 20 C.F.R. § 404.1545(a)(1). "A person's 'residual functional capacity' is determined by combining an assessment of an applicant's impairments with descriptions by physicians, the applicant, or others of

any limitations on and the applicant's ability to work." <u>Bayer v. Colvin</u>, 557 Fed.Appx. 280, 289 (5th Cir. 2014) (quoting <u>Hollis v. Bowen</u>, 837 F.2d 1378, 1386-87 (5th Cir. 1988)).

As noted above, the ALJ gave no weight to Dr. Hilbun's statements regarding Aymond's mental impairments as it was not supported by the evidence in the record, even though the ALJ did give some weight to his opinion regarding Aymond's physical limitations. It is "within the discretion of the ALJ to determine the credibility of the various medical reports in the record." <u>Bayer v. Colvin</u> 557 Fed. Appx. at 288 (quoting <u>Griego v. Sullivan</u>, 940 F.2d 942, 945 (5th Cir. 1991)). Therefore, the ALJ did not err in determining that Aymond did not have the medically determinable severe impairment of slowed cognition. This argument is without merit.

### D.   <u>The ALJ properly applied the Grid Rules at step five.</u>

Aymond next contends that the ALJ erred in his reliance upon the grids, or alternatively, the ALJ relied upon the wrong grid, and therefore failed to carry the commissioner's burden of proof at step five.

Aymond's first argument is that reliance upon the grid was inappropriate as a result of Aymond's mental limitations. As discussed above, because the ALJ did not err when she determined that Aymond did not prove that he had a severe mental impairment, this argument is without merit.

Aymond alternatively contends that the ALJ's reliance on the grids was error as a result of Aymond's visual limitations, specifically his complete blindness in his right eye, and limited vision in his left eye, which has 20/30 vision.

24

The ALJ may use the Medical–Vocational Guidelines (the "grid rules") to determine whether a claimant is capable of performing other work or is disabled. "However, use of the grid rules is only appropriate 'when it is established that a claimant suffers only from exertional impairments, or that the claimant's nonexertional impairments do not significantly affect his residual functional capacity.'" Watson v. Barnhart, 288 F.3d 212, 216 (5th Cir. 2002) (quoting Crowley v. Apfel, 197 F.3d 194, 199 (5th Cir.1999)).

Additionally, as to visual impairments, SSR 85-15 states:

> As a general rule, even if a person's visual impairment(s) were to eliminate all jobs that involve very good vision (such as working with small objects or reading small print), as long as he or she retains sufficient visual acuity to be able to handle and work with rather large objects (and has the visual fields to avoid ordinary hazards in a workplace), there would be a substantial number of jobs remaining across all exertional levels. However, a finding of disability could be appropriate in the relatively few instances in which the claimant's vocational profile is extremely adverse, e.g., closely approaching retirement age, limited education or less, unskilled or no transferable skills, and essentially a lifetime commitment to a field of work in which good vision is essential.

The ALJ found that Aymond's additional limitations had little or no effect on the occupational base of unskilled sedentary work (Doc. 11, p. 28/326). Aymond had worked at substantial gainful activity level with his visual limitations and had sufficient visual acuity to handle large objects, and to see small objects and visual fields necessary to avoid hazards in the workplace. (Doc. 11, p. 28/326). Aymond has not shown that monocular vision reduces the occupational base of sedentary work. Accordingly, this argument is also without merit.

25

III.   **Conclusion**

Based on the foregoing, IT IS RECOMMENDED that Aymond's appeal be DENIED AND DISMISSED WITH PREJUDICE.

Under the provisions of 28 U.S.C. § 636(b)(1)(c) and Fed.R.Civ.P. 72(b), parties aggrieved by this Report and Recommendation have fourteen (14) calendar days from service of this Report and Recommendation to file specific, written objections with the Clerk of Court. A party may respond to another party's objections within fourteen (14) days after being served with a copy thereof.  No other briefs (such as supplemental objections, reply briefs, etc.) may be filed.  Providing a courtesy copy of the objection to the undersigned is neither required nor encouraged. Timely objections will be considered by the District Judge before a final ruling.

Failure to file written objections to the proposed findings, conclusions, and recommendations contained in this Report and Recommendation within fourteen (14) days from the date of its service, or within the time frame authorized by Fed.R.Civ.P. 6(b), shall bar an aggrieved party from attacking either the factual findings or the legal conclusions accepted by the District Judge, except upon grounds of plain error.

THUS DONE AND SIGNED in chambers in Alexandria, Louisiana, this ___17th___ day of November, 2016.

Joseph H.L. Perez-Montes
United States Magistrate Judge